Good morning to the court. My name is Anthony Riplier. I represent Mr. Bradshaw. I was also trial counsel before Judge Matz, before the jury trial. I would only like to argue the identity theft count at this point. I will submit on the other arguments. As the court will recall, this seems to be the most important count. Judge Matz gave Mr. Bradshaw 30 days on the underlying counts. But the identity theft count is a mandatory two years. If the court had a chance to read Judge Matz's comments at the time of Rule 29, or post-trial Rule 29 and his sentencing, Judge Matz, I think, really denied Rule 29 reluctantly in this case. I think he actually said he hoped he was reversed by the Ninth Circuit. That's unusual for him. That is very unusual. So I think it really comes down to this. I think it really comes down to this. And I think, hopefully, we put it together for the court in our reply brief at page 4. Judge Matz asked trial counsel for the government. What Agent Miller testified to as to what Mr. Bradshaw had said, as to his knowledge that Dr. Shard had left Glen Mountain, at the time Bradshaw did his last submission under the UPenn number, which was August 31. And Judge Matz said, and I'd like to quote, if I may, the court. So you're telling me that Miller testified that Bradshaw told him that it was on or about August 20, but in any event, sometime before August 31, that he, Bradshaw, learned that Shard wasn't working there, right? And Mr. Louie, one of the prosecutors of the case, said, yes, Your Honor. Well, the record doesn't bear that out. That's the problem. What happens is Bradshaw goes to Israel, returns on or about August 20. We know that. We also know that Dr. Shard, who I submit respectfully, wasn't the most forthcoming of witnesses in the case, as to telling the truth, because he changed, we had to drag, I had to drag it out of him, that in fact, he did not revoke his UPenn number until September 5, which is four or five days after Bradshaw makes his last submission. And how should we consider that? How should that bear on whether the jury could have found what it needed to find to find a conviction here? Because, in fact, there wasn't enough evidence to show that Bradshaw even knew. And here's why I think that's a very good question. Well, let me ask you this. As I understand it, Dr. Shard testified he met Bradshaw on only one occasion and never returned to Glen Mountain. Do you dispute that in any way? Well, that's his testimony. Okay. Is there any evidence to the contrary? No, there's not. Okay. He indicated that he told Sands he didn't want to work at Glen Mountain, and despite the signed agreement, he never acknowledged, never authorized anyone at Glen Mountain to use his UPenn number. Do you disagree with that? That's what he said. Okay. Is there anything to the contrary from your client or any other witness? Well, in this sense, yes. He had – our position was that Bradshaw was working under the agreement, under the delegation of services agreement, which was not revoked until September 5. And when you ask me, Your Honor, how that bared – the September 5 revocation bared on the issue, I think it's important to note that I think it goes – it helps Bradshaw because at – because there were no billings made after September 5. Okay. And I respect what you're driving at, counsel, but ultimately it gets down, since there's no contrary testimony to what we just talked about, under the delegation of services agreement, it only authorized the physician's assistant to, in quotes, transmit the supervising physician's prescription and to operate under the physician's – excuse me, the physician's direction. It didn't authorize the physician's assistant to do an autonomous stand-in for the physician. Well, except that I think the evidence in the record indicates that the arrangement was that Shard would be a person who would, in fact, review these records. A lot of doctors review records. But remember here, what we're talking about under Jackson is whether there was reasonable evidence that the jury could have found these things. And here you've got the testimony of – Dr. Shard says he met Bradshaw once, he never saw him again, never went back to the facility. The delegation of services agreement says it's going to be under a physician's supervision, you can't use it independently, and yet the evidence – there is at least evidence in the record, is there not, that that is, in fact, what Bradshaw did? Yes. There is evidence in the record. But there's also evidence in the record that Heath Bradshaw, in terms of his knowledge, thinks he's operating under the agreement. I understand that. And that's part of what you put before the jury, right? Correct. The jury had that information, and it could have decided that your client was correct, but it did not. Well, that's the record. Okay. So when you get past that, then you get to the issue of what it means to use, right? Yes. Isn't that really what it comes down to? Well, I think it really goes to what it means to use, which includes knowledge. You have to have knowledge that it's unlawful. Okay. But again, it's also what the jury decided. You, I'm sure, well put before the jury your position. But in this case, Heath felt your client filled out prescription forms for motorized wheelchairs on behalf of a physician who the evidence showed never worked at Glen Mountain and had no more than one introductory conversation with Bradshaw. So how in does that not fulfill the concept of the word use? Because I think use includes, it would have to include that he used it with knowledge that it was unlawful. That's the whole point. But the jury can imply that, can it not, from what he did? Your Honor, the government picked this fight. What the government said to Judge Matz, because I think Judge Matz, if he had, if the government hadn't inadvertently misquoted the record at the time of our post-trial at Rule 29, I think Judge Matz might have ruled differently. You can tell from reading the sentencing in the Rule 29 transcript, he wasn't happy with the government. He wasn't happy with this conviction on particular, on count 13. And he asked them, he said to the government, does the evidence show that Bradshaw knew prior to August 31 that the UPIN number, that Dr. Shard hadn't, wasn't working there? And they said yes. The government said yes. But that is absolutely not the evidence. I want to follow up on Judge Smith's question. I want to make sure that I understand it. So your contention is that until Dr. Shard formally withdraws his UPIN number, even though he's no place to be found on the premises, he is at no involvement, so far as Bradshaw can tell, with reviewing any of his work or any of his files or any of his recommendations, that it's not until Shard formally withdraws the use of his UPIN number that Bradshaw can be convicted of identity theft? Yes. Okay. And what's the law for that? Well, I mean, I think it really comes down to a factual finding. I really think it comes down to a factual finding. But that's the jury's province, is it not? Well, that's the jury's province, but there has to be substantial, there has to be substantial evidence. What I think argues well for Bradshaw is that, let me put it this way, let me start again. What argues well for Bradshaw is, if you'll recall, the government never claimed identity theft on any of the counts prior to August 31, prior to the August 31 UPIN submission. So I think the government, by charging the case that way, concedes that under the agreement that wasn't revoked until September 5, that in fact there wasn't an identity theft. Why? The reason is because he was working under the belief that Shard, Dr. Shard, was reviewing these documents. But your argument, I mean, you're a very able lawyer, and I don't question your ability to pursue this line. But the reality is that the government frequently will make decisions, sometimes last-minute decisions, on how to charge somebody, right? Well, I would say that's true. I know you were. And the fact is they decided to charge him in this way. They presented the evidence to the jury. The jury believed the government. The jury believed that there was enough evidence here by the actions of your client that it showed that he knew he had no authority to do this and that he used this ability to write prescriptions for motorized wheelchairs in a way that was an identity theft. As an advocate, I respectfully disagree. And I disagree because of what I just argued, the way the government charged it. I would completely agree with you if after September 5, after the UPIN number was revoked by Dr. Shard, that Bradshaw had then built. I would have no problem with that. But we have this finite period of time where it's unclear. And when I say unclear, what I'm really arguing is that there's not substantial evidence that, in fact, Bradshaw knew. He just gets back from Israel. Agent Miller testifies sort of equivocally, but he says sometime after August 20, 2007, that Bradshaw tells him he knows that Shard is gone at that point. Well, he knew Shard was gone all along because the agreement said he had to consult with him. So if he had the agreement, if he looks at the agreement, he knows he's supposed to be consulting with the physician. He certainly doesn't deny that he signed the agreement, right? Correct. Okay. So he has a document. The document says you've got to have a supervising physician. Somebody's got to review this. You can't act independently. He knows he's not seeing Dr. Shard. He's not there. He's not reviewing anything. So how can you say that he doesn't know or can be imputed to know pretty clearly through the contract that he's not following the delegation of authority? Because the evidence, my recollection of the evidence at the trial was that Shard was going to come by every now and then. But he didn't. He could come by at night. But he did not. He did not for an extended period of time. And lots of motorized wheelchairs were run out the door on that based upon this UPIN number, right? He said he didn't. But he also said that he was going to revoke it. So you're suggesting that Shard actually did show up and he did talk to your client? I don't know. There's no evidence to that. But that's correct. And the only evidence is that this agreement was in effect when, in fact, he made the last billing. And I think, again, I think it is important to note the government had a lot of time to tactically indict this case, present whatever proposed indictment they wanted to the grand jury. And they didn't charge identity theft on the counts prior to August 31. So you have this no man's land of about 15 days. And that's why, see, I think Judge Matz, I really think Judge Matz was inadvertently misled by the government when he asked the critical question. Again, Counselor, you're an able lawyer. But, you know, I know Judge Matz is a fine judge, fine person. But none of this is in the record. This is all your speculation. And I appreciate the fact that you have those thoughts. But what possible role can that play in our determination? We're bound by the record, are we not? You're bound by the record. And the government inadvertently, I'm sure, misquoted the record. They said that sometime, in any event, sometime before August 31, pursuant to Judge Matz's question, that Bradshaw learned that Shard wasn't working there. Wouldn't the fact that patients were being prescribed wheelchairs that were not necessary have alerted Bradshaw to the fact that Shard was not reviewing these records and provide evidence that the jury could consider in determining whether he knew Shard was gone? Well, I mean, you're asking me to speculate as to Bradshaw's state of mind. Bradshaw didn't testify. But the jury could deduce from the fact that wheelchairs were being prescribed by Bradshaw to individuals who did not need them that he had to know that his prescriptions were not being reviewed by Dr. Shard. I completely disagree. I think that Bradshaw operates in good faith. I think the record bears it out because of the way the government indicted the case and the fact that he never sent, after he knows, after the UPIN is revoked on September 5, Bradshaw, there's never another prescription. So he's not operating under, he knows at that point, apparently, he's not operating under a delegation of services. Well, he certainly knows that that UPIN number is no longer valid. It's like, you know, somebody using your ATM card and you go in and use the ATM card and get a whole bunch of money out and so on, perhaps on an unauthorized basis, and you find suddenly the card is revoked. You can't use it anymore. That's really what this is, is it not? I mean, the UPIN number is not valid anymore. It couldn't use it, even if you wanted to. But he didn't try. I understand that. But even if he had tried, it would not have worked. I again go back to the judge's question, and I'll end at this point, maybe save a little bit for rebuttal, that the government misled, inadvertently, I'm sure, the court when they said that, in fact, Miller testified to Bradshaw, told him that it was before August 31, before, a specific question, August 31, when he made the last billing. Anyway, that's my argument. Okay. Thank you very much. Thank you. Mr. Brooklier. Mr. Kim. Good morning. I may have pleased the court beyond Sue Kim for the United States. The issue on this appeal is whether the delegation of services agreement that opposing counsel is referring to somehow precluded a rational juror from finding that the defendant knew that his use of Dr. Brashard's UPIN and medical license was without lawful authority. And I would suggest to the court that that issue can, in turn, be broken into two issues. First, there's the issue of whether or not there was lawful authority. And then the second issue is what the evidence was of the defendant's knowledge that he lacked lawful authority. Counsel, before you go down that path, that's just fine with me, if you want to address those points. But I do want to clarify something that Mr. Brooklier said. And that is that with respect to this count, that the government only charged Bradshaw with actions occurring after August 31st. Is that correct? No, Your Honor. On August 31st. On August 31st. Yes, Your Honor. Okay. So what does the government have to show that occurred on August 31st? Is that the last prescription that Mr. Bradshaw wrote? I don't know if it's the very last prescription that he wrote, but it's the last prescription that he wrote that was charged in the indictment. He was convicted of an underlying health care fraud charge based on the August 31st, 2007, prescription to a woman named Maria Rodriguez. Right, right. I understand those are the other counts that Mr. Brooklier is happy to submit on the briefs. Yes. And then the identity theft, aggravated identity theft charges in turn based on that same conduct that occurred on August 31st, 2007. What the government needed to prove was that he did use Dr. Shard's UPIN and or medical license number on that date without lawful authority. If the government had charged unlawful the identity theft for some other date, let's pick a date in April. Of 2007, Your Honor. Of the same year. So earlier. So right, four months earlier, but during the time when Dr. Shard's UPIN number was on file over at Glen Mountain, he'd signed the supervision form. Would the government's burden be any different than it was on August 31st? I don't think that its legal burden would be any different, Your Honor, but factually the government would have had a harder case, frankly, because what the government relied on to prove the defendant's knowledge that he lacked lawful authority as of August 31st, 2007, were in part, and I would say principally, statements that the defendant himself made, not simply to Special Agent Miller, and that's the return from Israel on August 20th, 2007 statement, but another statement made to a different investigator at a different time, namely California DOJ investigator Sartoff at GER 208, I believe, where he says that the defendant told him that he knew as of July of 2007 that Bradshaw was no longer working at the time. So basically your response is the government could have charged him at an earlier point, but this was the optimal point to charge him because you had so much information that was focused on that particular time period. Correct, Your Honor. We have the July 2007 statement. I'll refer to it as that. Then we have the August 20th, 2007 statement. Both of those statements indicate that the defendant knew as of August 31st, 2007 that Shard was no longer working there. The defendant acknowledges the significance of him no longer working there with respect to his ability to prescribe because he further says to the special agent that upon learning that Shard was no longer working there, he saw that Shard had taken his prescription pad with him and that the defendant himself and another individual at the clinic proceeded to rip up all of the remaining prescription forms that Dr. Shard had left. And so he clearly knew. Can I ask you one question? It's a little bit off to the side, but I'm interested in this. How did Bradshaw benefit from this? I mean, we get a lot of cases. Indeed, we have some submitted here where people were making hundreds of thousands of dollars from Medicare fraud. What did Bradshaw get out of this? Your Honor, the best answer that I can provide to that question is that he got his job employed by a medical clinic that was entirely permeated by fraud. Is there any evidence that he would have been fired had he not gone along with this? There is no specific evidence, Your Honor. You want us to basically say, to presume basically that he got something out of it, but we don't know what it is. Well, I would say that he got his job, the entire clinic, Your Honor, based on the evidence. So you're suggesting that when he went there to start with, that he knew this was a fraudulent operation and he knowingly participated from the beginning? Well, I don't want to overstate. If so, what evidence are you relying on? Well, I think that I wouldn't want to go that far. I think that certainly as of 2007, and this goes to Judge Dawson's question to counsel about whether simply the fact that he's prescribing all of these motorized wheelchairs to individuals can work, in effect gives him notice and knowledge that he's not really being lawfully supervised. Does it matter that he got nothing out of it? It does not matter. It does not matter. So in other words, one of the elements of the crime is not that he gets something for it. It is not, Your Honor, one of the elements. But again, given that the entire clinic wouldn't have existed, based on the record, I think, had it not been engaging in this massive Medicare fraud, he wouldn't have presumably had a job or otherwise. I was talking about Judge Dawson's question. I do think, Judge Dawson, that there is a basis for inferring knowledge simply based on the fact that the defendant is prescribing these wheelchairs. I would also note, with respect to this issue of knowledge, that the defendant testified or, excuse me, he didn't testify, but stated to one of the investigators that Shard would come to the clinic once or twice a month for the entire period of the Delegation of Services Agreement. When he was asked, on two separate occasions, to try to identify Dr. Shard, first by just being shown pictures of Dr. Shard, and then through a six-pack identification lineup, he was unable to identify Dr. Shard. So I think that the evidence does clearly establish knowledge of the unlawful use of authority. There's also the predicate issue of whether, putting aside knowledge, whether there was any lawful authority. I don't want to take this Court's time unless the Court had a question about that issue, because I think the issue principally is the one of knowledge. Unless the Court has any other questions, I will submit on the briefs. I don't see any other questions. Thank you very much, Mr. Kim. Thank you, Your Honor. Mr. Brooklier, I'll afford you another minute or so to, if anything, the Court needs to hear. I've made my argument, basically, so I'm not going to repeat it. Can I follow up on one thing, then? Of course. The counsel just said, I had asked you previously a similar question, but counsel just represented that the defendant claimed that Dr. Shard came by every couple of weeks or so to basically do his part under the Delegation Agreement. Do you agree that that was stated by your client to the inspector? Yes. Okay. Yes, that was in the record that's part of the trial transcript. And is that false? I mean, or we just get down to who believes whom? Well, that's the record. That was part of the trial record that, through the agent, Bradshaw had made the statement that Shard, who thought Shard was coming by once or twice. So your client knew under the Delegation Agreement he had to get Shard's approval of the prescriptions, right? Well, I think the best way to look at it is it's clear that Shard wasn't standing over his shoulder. Right. Because if Shard was there, what do you need Bradshaw for? But these PAs, these positions assistants, will write prescriptions, and I think that Bradshaw had the right to believe under the Delegation Agreement that he was being supervised, they were being looked at, by Shard. Otherwise, why is there a delegation? And he apparently claimed, according to the government, that Shard came by approximately every two weeks to do just that. Okay. He didn't do that, apparently, according to Dr. Shari. So what should the jury infer from that? You know, when you say according to Dr. Shard, Dr. Shard also testified, I know this is credibility, but I think it's worth saying, Dr. Shard also testified that he didn't read the agreement, didn't know anything about it. He told the jury under oath that, in fact, he had revoked the agreement back in May of 2007 until I showed him the actual revocation being on September 5. Did your client ever, I know he didn't testify at the trial, but did he ever say to the government or any government investigator that he had never read the agreement? No. I think he relied. I think he relied on the agreement. So he knew the agreement, he knew what he had to do under the agreement. I think that's fair to say. I think it's fair to deduce. That's a reasonable conclusion. Okay. Here's the only other thing I would say. I was there when Judge Matz did the post-trial Rule 29. I was there when he did the sentencing. He wasn't happy. He was not happy. That's why, as I mentioned earlier, he said, I hope I'm reversed by the Ninth Circuit. I think there's another alternative here, and I respectfully submit this. I think that Judge Matz was misled by the government, and I know both of the prosecutors, and I certainly don't think it was intentional. But when they told him that it was sometime, the record indicated it was sometime before August 31, that Bradshaw learned the chart wasn't working there, I think that if, and I disagreed with it. I said that's not my recollection, and then Judge Matz, that was enough for him at that point. He says later, right after the government tells him, yes, he knew. He said, all right, Mr. Brooklier, there is evidence in the record that your client knew he couldn't use the U-pin. He could charge wasn't working there on August 31. That's not true. That's absolutely not true. Nobody ever said that. No agent ever said that. So what I was going to suggest, respectfully, is if the court thought it was appropriate, this case could be remanded back to Judge Matz for a further finding as to knowledge, because I do think that he was, in fact, unintentionally misled. Thank you very much. Thank you. We thank both counsel for the argument. Bradshaw is submitted. Thank you. The next case is Mahoney v. Carlsbad Unified School District.
judges: Dawson, Bybee, Smith M.